**KNEUPPER & COVEY, PC**
Kevin Kneupper (CA SBN: 325413)
kevin@kneuppercovey.com
A. Cyclone Covey (CA SBN: 335957)
cyclone@kneuppercovey.com
A. Lorraine Weekes (CA SBN: 332369)
lorraine@kneuppercovey.com
17011 Beach Blvd., Ste. 900
Huntington Beach, CA 92647
Tel: 657-845-3100
Fax: 855-596-3707

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN SILVA on behalf of himself and all others similarly situated and, RUSSELL HARRINGTON on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>MONEY NETWORK FINANCIAL, LLC and FISERV, INC.,<br><br>Defendants. | Case No.: 2:23-cv-6798<br><br>**CLASS ACTION COMPLAINT FOR:**<br>(1) Violation of the Unfair Competition Law;<br>(2) Negligence;<br>(3) Breach of Fiduciary Duty;<br>(4) Breach of Contract (Third-Party Beneficiaries); and<br>(5) Breach of Implied Covenant of Good Faith and Fair Dealing (Third-Party Beneficiaries).<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ruben Silva and Russell Harrington ("Plaintiffs"), by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants Money Network Financial, LLC ("Money Network") and Fiserv, Inc.  Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals whose California Middle Class Tax Refund was paid to them (or not, as the case may be) through debit cards issued

by Defendant Money Network and who did not receive the full benefit of their MCTR and allege as follows:

## INTRODUCTION

1.     In 2022, with inflation raging and the worst of the COVID-19 Pandemic barely in the rearview mirror, California's legislature passed the Better for Families Act to help Californians like Plaintiffs Silva and Harrington.  The law, which sought to "provid[e] financial relief for Californians who may have been adversely impacted" by recent economic disruptions, provided for a one-time payment of between $200.00 and $1050.00 to California taxpayers who met certain criteria.

2.     California's Franchise Tax Board ("FTB") outsourced much of the disbursement of this payment (the "Middle Class Tax Refund" or "MCTR") to a private, for-profit, Georgia-based company, Defendant Money Network.

3.     The contract between the FTB and Money Network provided that the FTB would pay Money Network up to $25,335,200.00 and, in exchange, Money Network would administer the disbursement of the MCTR to eligible Californians via debit cards issued by a partnering bank (New York Community Bancorp Inc.).

4.     The contract between the FTB and Money Network required that each MCTR debit card Money Network issued to a MCTR recipient contain an EMV chip.  Specifically, Plaintiffs are informed and believe that, in its statement of work, the contract between Money Network and the FTB provided: "The State shall require the use of an EMV (Europay, MasterCard, and Visa) chip enabled card to offer the maximum protection possible."

5.     EMV chips are a standard security measure found in the debit and credit cards issued by most major banks and play a key role in mitigating fraud risk and keeping consumers safe.

6.     Money Network pocketed millions in California taxpayer money and then cut corners in ways that left many middle class Californians either unable to obtain their MCTR or highly vulnerable to fraudsters who stole all or part of their MCTR.

7.   For example, though Money Network's contract with the FTB obliged it to issue chip enabled MCTR debit cards, many of the MCTR debit cards issued by Money Network did not contain EMV chips.

8.   Many eligible Californians, like Plaintiff Harrington, have, as a result of Money Network's incompetence and maladministration, not yet received the MCTR to which they are entitled.

9.   Other eligible Californians, like Plaintiff Silva, have received a debit card from Money Network, but not the full benefit of the MCTR to which they are entitled. The chip-less cards Money Network issued were highly vulnerable to scammers; many Californians had their MCTR funds drained from their chip-less Money Network debit cards, sometimes before they ever even received the cards themselves.

10.   This lawsuit seeks to hold Money Network and its parent company Fiserv Inc. accountable for damaging Californians like Plaintiffs Silva and Harrington by shirking its legal and contractual duties to those Californians and the FTB.

## JURISDICTION

11.   This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. section 1332(d) because this is a class action brought on behalf of more than 100 putative class members in which the amount in controversy exceeds $5,000,000 and all of the putative Class Members are citizens of a state (California) different than the states of which Money Network and Fiserv, Inc. are citizens; and (b) 28 U.S.C. section 1332(a) because there is diversity among the Parties and the amount in controversy exceeds $75,000.

12.   This court has supplemental jurisdiction under 28 United States Code section 1367 with respect to the claims for relief arising under state law.

13.   This Court has specific personal jurisdiction over Money Network and Fiserv, Inc. because both companies have sufficient minimum contacts with California, have purposely availed themselves of the benefits and protection of California law, and conduct a substantial amount of business in and with the State of California, such that the Court's exercise of personal jurisdiction over them is reasonable and accords with due process.

**VENUE**

14.    Venue is proper pursuant to 28 U.S.C. section 1391(b)(2).

**THE PARTIES**

15.    Plaintiff Ruben Silva is a citizen of the State of California and resides in Goleta, California.  Mr. Silva has a disabled adult son.  Together with his wife he was entitled to a $1,050.00 MCTR payment. He received a debit card (sans EMV chip) from Money Network but not the full benefit of his MCTR: he believes a fraudster depleted most of funds from his chip-less card before he was able to use them.

16.    Plaintiff Russell Harrington is a citizen of the state of California and resides in Clovis, California.  Mr. Harrington is middle class.  He is entitled to an MCTR, but —despite his having spent hours of his life on the phone (and on hold) with Money Network — Money Network has failed to disburse his MCTR to him.

17.    Defendant Money Network Financial, LLC is a Delaware limited liability corporation with its principal place of business in the State of Georgia.  Money Network Financial, LLC is a wholly-owned subsidiary of Defendant Fiserv, Inc.

18.    Defendant Fiserv, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin.

**FACTUAL ALLEGATIONS**

***Factual Allegations Common to the Class***

19.    On June 30, 2022, Governor Gavin Newsom signed California Assembly Bill 192 into law.  The law, the Better for Families Act, was intended to provide economic relief to millions of middle class Californians who were being battered on all fronts by inflation, rising costs due to supply chain shortages, and the protracted financial reverberations of the COVID-19 emergency.

20.    The law authorized a one-time payment of between $200.00 and $1,050.00 to qualified taxpayers. It also mandated that any contracts with third-party vendors for services related to the MCTR's distribution optimize for fraud mitigation, providing that "the state may contract with a third-party vendor for services relating to the distribution of

payments made pursuant to this chapter in the form and manner best determined to expedite payment and mitigate fraud." *See* Cal. Welf. and Inst. Code § 8163.

21.   California's FTB contracted with Defendant Money Network to provide services relating to the distribution of MCTR payments.

22.   The contract between the FTB and Money Network concerning the MCTR administration (the Agreement) provided that California's FTB would pay Money Network up to $25,335,200.00 to "process and mail payments to California residents on behalf of the State of California by way of Debit Cards in accordance with the direction provided by the State."

23.   The Agreement contained numerous provisions designed to ensure — as the Legislature had mandated — that the third-party the state was contracting with would perform its MCTR-related services "in the form and manner best determined to expedite payment and mitigate fraud:"

   a.   The Agreement's statement of work provided: "The State shall require the use of an EMV (Europay, MasterCard, and Visa) chip enabled card to offer the maximum protection possible."

   b.   The contract also required that Money Network "[p]rovide sophisticated fraud prevention services with evidence of preventing fraud at a success rate of ninety-nine percent (99%) or higher."

   c.   Money Network was obliged to "[p]rovide fraud prevention services from the point of receiving recipient account information and until all debit card balances have been exhausted by each recipient or returned to the state due to expiring."

24.   Money Network has not provided reasonable or adequate fraud prevention services, let alone "sophisticated" fraud prevention services, and has distributed thousands of MCTR debit cards that are not EMV chip enabled.

25.   As a result of Money Network's maladministration of the MCTR payment program, many Californians (like Plaintiff Harrington) have never received their MCTR debit cards

and still others (like Plaintiff Silva) have received non-chip enabled MCTR debit cards and had their MCTR funds rapidly depleted by scammers who, predictably, took advantage of the low-security chipless cards' vulnerabilities.

26.    The fraud proliferating around the MCTR program means that, in effect, California taxpayers have paid Money Network millions of dollars to channel cash from State coffers into the hands of criminals.

27.    The fraud that has proliferated around Money Network's failure to take reasonable or adequate fraud-prevention measures has attracted significant media attention.[1]

28.    On internet forums, posters commiserate about losing their MCTR payment to fraudsters almost instantly upon activating their Money Network debit cards:

> a.    On or around December 2022, a user with the name "phoenyx9" posted on the Internet forum Reddit: "my card was drained before I could use it. I have been calling customer service since Friday the 16th to report the fraud and have yet to speak to anyone. The system asks for my card number; when I enter it, I'm told there is a high call volume or there is a system wide outage and then hangs up.  btw, I activated it and the money flew out of there. The money was all spent within 30 minutes. If anyone is going to use this card, spend the funds immediately upon activation."[2]
>
> b.    On or around December 2022, a user with the name "sadisticallyspeaking" posted on the Internet forum Reddit: "I activated my card today and it told me I have a balance of $0.00. Created an account online and checked that two

---

[1]    *See, e.g.*, Michael Finney and Renee Koury, "Hackers took their Middle Class Tax Refunds and now victims are getting a tax bill," ABC7 News (February 9, 2023), https://abc7news.com/california-middle-class-tax-refund-scam-taxes-mctr/12793165/ (last accessed July 29, 2023); Kelli Saam, "Californians Report Stolen Middle Class Tax Refunds," (January 13, 2023, updated February 23, 2023), https://www.actionnewsnow.com/news/californians-report-stolen-middle-class-tax-refunds/article_d0b9b2e0-935f-11ed-90c3-533fe0694afb.html (last accessed July 29, 2023).

[2]    *See* phoenyx9, Comment to *Card Drained, customer service hung up on me*, Reddit, https://www.reddit.com/r/stimuluscheck/comments/zqx6qo/comment/j132sry/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button (last accessed July 30, 2023).

purchases at Marshall's in multiple counties over from me were made at times that haven't happened yet today. I activated my card at 9:30am PST and both transactions shown were at times 10:00am PST and 10:22am PST for todays date. It seems like the transactions were immediately made once my card was activated. Ofcourse the money network customer service is only open on weekdays. I locked my card immediately. Has anyone else had this happen to them?"[3]

c. On or around November 2022, a user with the username GhostAndGrace posted on the online forum Reddit: "Just curious if this has happened to anyone else. Got the card and activated it about a week ago, made a pin and everything. Account balance $700. I just held onto the card and waited for the next grocery store trip, which was this afternoon. We go in and the card doesn't work. Super annoying. Get home and try to figure it out. Out balance is now $0 and someone about 2 hours away used it for $513 at Dick's Sporting Goods, then a few small purchases until it was empty. It hasn't left my wallet and like I said, I made a pin. Anyone else have their card ripped off? I'm not looking forward to having to deal with all this on Monday when customer service opens."[4]

29.   Plaintiffs are informed and believe that these posts accurately reflect the experiences of the posting users with MCTR fraud and Money Network.

30.   There is nothing surprising about the fraud that ensued when Money Network issued MCTR benefits on non-EMV chip enabled cards: the magnetic stripe technology in the EMV chip-less cards Money Network distributed to many members of the Class is widely

---

[3]   *See,* sadisticallyspeaking, Comment to *Thieves are draining California MCTR debit cards*, Reddit, https://www.reddit.com/r/stimuluscheck/comments/zmty2v/comment/j0ly4x1/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button (last accessed July 29, 2023).
[4]   *See* GhostAndGrace, *Anyone else had the money stolen out of their MCTR account?*, Reddit, https://www.reddit.com/r/stimuluscheck/comments/zi8d9q/anyone_else_had_the_money_stolen_out_of_their/ (last accessed July 29, 2023).

known in the financial industry to be less secure than EMV chip technology.

31.    Despite the rampant MCTR-related fraud, Money Network appears blithely indifferent to the damages its failure to take reasonable and adequate fraud prevention measures have caused Plaintiffs and the Class.  This blithe indifference is evidenced in its failure to adequately staff customer services lines and the extent to which it has made it difficult for MCTR recipients to report fraud.  For example, in a May 15, 2023, article titled "California Middle Class Tax Refund: As issues persist, options narrow for getting a real person to help," one investigative news agency reported that when it "called the [MCTR] activation line and followed prompts to report fraud, at least one path in the maze of voice prompts led to the call being disconnected."[5]

32.    Online, MCTR recipients have complained they've called in to Money Network for help with fraud or even obtaining their MCTR card in the first place only to be met with an automated recording stating that, due to high call volumes, their calls could not be answered.

33.    For example, in or around March 2023, a user named "Ctrl-Alt-DL337" posted on the Internet forum Reddit: "I never received my card in the mail, but received a letter warning me to activate my card before the expiry date. The letter also said that if I never received my card, I should call their customer service line. So I did. And have been, for a few days now. It doesn't matter when I call, whether it be at opening, middle of day, or closing -- everytime I try to get my issue resolved, the hotline tells me that 'due to high call volume we can not accept your call at this time, please try again later. ' I'm worried that I'll never be able to connect, and then ultimately miss out on my refund. What the heck should I do??"[6]

34.    Responding to a post titled "Card Drained, customer service hung up on me," a Reddit

---

5        Daniel Macht, "California Middle Class Tax Refund: As issues persist, options narrow for getting a real person to help, KCRA3, https://www.kcra.com/article/california-middle-class-tax-refund-issues-persist-help-line-real-agents-fraud-reporting/43880142 (last accessed August 14, 2023).
6        Ctrl-Alt-DL337, *MCTR Customer Service Phone Line Always Busy*, Reddit, https://www.reddit.com/r/stimuluscheck/comments/12br425/mctr_customer_service_phone_line_always_busy/ (last accessed July 30, 2023).

user with the name "MandaEskimo" posted in or around December 2022: "I can't get anyone to answer at all, I've been calling every 30 minutes for the last two days and it either hangs up on me immediately, or rings for 15 minutes then hangs up as soon as it hits the 15 minute mark."[7]

35.    Plaintiffs are informed and believe that these posts accurately reflect the experiences of the posting users with Money Network's customer service line.

36.    Plaintiff Harrington has also experienced being hung up on by Money Network when he called to ask for assistance with obtaining his MCTR debit card.

37.    Plaintiffs are informed and believe that Defendant Fiserv fully owns Money Network Inc. and exercises a degree of control over its actions such that Money Network is an instrumentality of Fiserv.

38.    Fiserv's website indicates that it has a location in Alpharetta, Georgia at 2900 Westside Parkway, Alpharetta, Georgia, United States 30004.  Money Network's principal address is 2900 Westside Parkway, Alpharetta, Georgia, United States 30004.

39.    The LinkedIn profiles of Fiserv executives suggest that Fiserv is extensively involved in the management and oversight of Money Network.  For example, Charles Busa lists himself as a Fiserv executive with the title "Vice President of Sales Money Network." Jenai Washington lists herself on LinkedIn as a Fiserv executive with the title "Senior Director, CFO Money Network." Charles S. Postell's LinkedIn page states that he works at Fiserv as a "Sales Executive, Digital Disbursements, Prepaid and Payroll Solutions Money Network."  And Gino De Jesus's LinkedIn page indicates that between June 2019 and November 2019 he was the "Director of Money Network and Digital Disbursements" at Fiserv, Inc.  These job titles suggest that Fiserv Inc. executives so control Money Network — as its CFO, Vice President of Sales, and "Director" — that Money Network is merely an agent of Fiserv Inc.

---

[7]    *See* MandaEskimo, Comment to *Card Drained, customer service hung up on me*, Reddit, https://www.reddit.com/r/stimuluscheck/comments/zqx6qo/comment/j10fdul/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button (last accessed July 30, 2023).

*Allegations Specific to Plaintiff Silva:*

***Money Network gave Plaintiff Silva a Chip-Less Card and Stood by as Scammers Stole the MCTR Intended for Mr. Silva and his Family***

40.    Mr. Silva is a middle class Californian.

41.    Mr. Silva and his wife were entitled to a $1,050.00 MCTR payment.

42.    Unlike Mr. Harrington, Mr. Silva received a MCTR debit card in the mail from Money Network.

43.    The card Mr. Silva received from Money Network did not have an EMV chip.

44.    Mr. Silva and his wife were able to use their MCTR card only a few times before the card was fully depleted.

45.    Mr. and Ms. Silva did not spend anywhere near the full $1,050.00 of their MCTR payment.

46.    Mr. and Ms. Silva are informed and believe that fraudsters took advantage of their chip-less MCTR debit card's security vulnerabilities to steal hundreds of dollars of their MCTR from them.

47.    In the documents it sent Mr. Silva at the time it disbursed his MCTR, Money Network did not alert Plaintiff Silva to the fact that his chip-less card was highly vulnerable to scammers and that, as such, it would be prudent of Mr. Silva to expeditiously withdraw the full balance of his MCTR from the fraud-vulnerable MCTR card as soon as he received it in order to limit the time fraudsters had to deplete his MCTR.

48.    The documents Money Network sent to Mr. Silva told him to use his MCTR "before it expired."  The expiration date on Mr. Silva's MCTR card was not until April, 2026.

49.    Had Mr. Silva been alerted to the risks of leaving his MCTR on the MCTR card he would have promptly withdrawn the entirety of his MCTR from the chip-less Money Network and held it in a more secure medium, e.g., cash.

50.    Mr. Silva realized that fraudsters had likely depleted his MCTR account when he tried to use the card and it was declined.  No one at Money Network ever alerted Mr. Silva to the fact that his MCTR account had been compromised.

51.    The MCTR website operated by Money Network invites MCTR debit-card holders to view their "balance and transaction history online any time at mctrpayment.com."

52.    After realizing that fraudsters had depleted his MCTR debit card, Mr. Silva attempted to view his transaction history online at mctrpayment.com.  He was unsuccessful.  He had the correct credentials for logging in but the website would not allow him to proceed to any sort of account homepage or to view any sort of transaction history associated with his card.

53.    Mr. Silva was damaged by Money Network's failure to take reasonable measures to combat and prevent fraud, for example including EMV chips in cards.  Specifically, he was denied the benefit of accessing and using a large portion of his MCTR payment after fraudsters predictably took advantage of the security vulnerabilities inherent in the chip-less card Money Network issued Mr. Silva and his wife.

### Allegations Specific to Plaintiff Harrington:

### Money Network has Never Given Mr. Harrington his MCTR

54.    Plaintiff Russell Harrington lives in Clovis, California, a diverse farming community that is a suburb of Fresno.

55.    FTB and Money Network representatives have both told Mr. Harrington that he was authorized for a MCTR in October 2022.

56.    As of mid-November 2022, Mr. Harrington had not yet received his MCTR debit card.

57.    Mr. Harrington called the FTB several times during December 2022 regarding the status of his MCTR.  Each time he was told that there were mailing delays.

58.    Mr. Harrington called the FTB's general number again in early January 2023 and was told to wait until late January 2023.

59.    When late January rolled around, Mr. Harrington still did not have his MCTR debit card.

60.    Mr. Harrington repeatedly contacted Money Network regarding his MCTR payment but was not able to get to the bottom of the problem. The Money Network agents he spoke

with refused to speak with him about his MCTR, placed him on hold for extended periods, and, on one occasion, hung up on him.

61.   In March 2023, Mr. Harrington asked the FTB to issue him his MCTR directly via check rather than via a Money Network debit card.  He filled out paperwork and mailed it to the designated address.

62.   In April 2023 Mr. Harrington received an unsolicited call from the FTB informing him that he had not yet activated his MCTR card.

63.   During the second week of May, Mr. Harrington was again contacted by a FTB staffer informing him that he hadn't activated his MCTR card.  Mr. Harrington explained that Money Network had never sent him his MCTR debit card and that his efforts to contact Money Network about this issue had been futile.  The staffer told Mr. Harrington his only option was to contact Money Network again.  Contradicting what Mr. Harrington was told in March 2023, this FTB staffer said there was no way for him to receive his MCTR directly from the FTB in the form of a check.

64.   It is now more than nine months after Mr. Harrington was authorized for a MCTR in October 2022.  A child conceived in that month would have been welcomed into the world by now but Money Network, despite, Mr. Harrington believes, having received money from the FTB for his MCTR, still has not issued Mr. Harrington his MCTR debit card. (Mr. Harrington has also not received his MCTR from the FTB.)

65.   Mr. Harrington has been damaged by Money Network's failure to provide him his MCTR debit card insofar as he has been deprived of the use of hundreds of dollars to which he is entitled.

66.   Mr. Harrington has suffered non-economic injuries as a result of Money Network's wrongful conduct.  Specifically, he has wasted hours of his life trying to gain access to his MCTR.  This includes time spent talking to, and on hold, with both Money Network and the FTB.

## **CLASS ACTION ALLEGATIONS**

67.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

68.    Plaintiffs bring this lawsuit individually and as a class action pursuant to Federal Rules of Civil Procedure Rule 23, seeking injunctive relief, declaratory relief, and damages on behalf of a class defined as follows (the "Class"): "All citizens of California presently eligible for a MCTR who have not had the benefit of the full MCTR amount to which they are entitled as of the date of this lawsuit."

69.    Plaintiffs further seek declaratory relief, damages, and injunctive relief on behalf of two sub-classes defines as follows:

> a. **No EMV Chip Subclass:** All class members whose MCTR debit cards did not contain an EMV chip and whose MCTR accounts were depleted as a result of transactions not authorized by the class member and from which the class member received no benefit.

> b. **No MCTR Subclass:** All class members who have neither received a debit card from Money Network nor otherwise obtained the benefit of their MCTR.

70.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

71.    Plaintiffs reserve the right to amend or modify the class descriptions by making them more specific or dividing the class members into further subclasses or limiting the issues.

72.    **NUMEROSITY:** Plaintiffs are informed and believe, and on that basis allege, that the Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of Californians who have been unable to access their MCTR is so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of qualified MCTR recipients geographically dispersed across the State of

California.

73. **COMMONALITY:** Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly affected by having been entitled to MCTRs that they either did not receive or did not fully (or at all) benefit from and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

74. **PREDOMINANCE:** Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to: whether Defendants' alleged conduct is unlawful; whether Defendants had a duty of care to the Class; whether the alleged conduct constitutes violations of the laws asserted; whether the Defendants' wrongful conduct was intentional or knowing; whether Plaintiffs and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

75. **TYPICALITY:** The claims asserted by Plaintiff Harrington and Silva in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

      a. Plaintiff Silva's claims are typical of the claims of the No EMV Chip Subclass.

      b. Plaintiff Harrington's claims are typical of the claims of the No MCTR Subclass.

76. **ADEQUACY:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the other Class members. Plaintiffs have retained competent counsel with substantial experience in complex litigation and litigation involving financial and consumer issues. Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class.

77. **SUPERIORITY:** A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number

of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, far outweigh any difficulties that it might be argued could arise in connection with the management of this class action. These benefits make class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery given that the absolute *maximum* amount of an MCTR is $1,050.

78.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification is also appropriate because Defendants acted, or failed to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured Californians, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiffs' claims for class-wide treatment is also appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

79.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Plaintiffs are informed and believe that Defendant Money Network has available to it the contact information of all Class members and that Class notice can therefore likely be directly sent to individual members of the Class if so ordered by the court.

**FIRST CAUSE OF ACTION AGAINST MONEY NETWORK AND FISERV**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**

*On behalf of the Class*

80.   Plaintiffs, on behalf of themselves and the Class, bring this claim under the "unfair" prong of California's Unfair Competition Law ("UCL").

81.   The UCL prohibits "unfair competition," which includes any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200.

82.   Money Network's practice of taking millions of dollars from California taxpayers in exchange for services related to the administration of the MCTR and then failing to fulfil its contractual obligations in connection with those services and failing to exercise reasonable care in the provisioning of those services, for example by failing to use EMV chips in the MCTR debit cards it sent the No EMV Chip Subclass, is an unfair practice.  In effect, Money Network's practice of issuing non-EMV chip debit cards is a conveyor belt that diverts taxpayer dollars from their intended beneficiaries (the Class) and moves them into the hands of fraudsters.

83.   Money Network's practice of taking millions of dollars from California taxpayers in exchange for services related to the administration of the MCTR and then failing to adequately staff the customer service lines it used to provide advice and guidance to MCTR recipients calling in to report fraud or their non-receipt of the MCTR is an unfair practice.

84.   These unfair practices are substantially injurious to Class members, including Plaintiffs Harrington and Silva.

85.   Plaintiff Silva and other members of the No EMV Chip Subclass were injured by Money Network's unfair practice of issuing vulnerable magnetic-stripe-only debit cards because they were left without adequate protection from fraudsters and suffered economic losses due to fraud that they, in all likelihood, would not have suffered if Money Network had complied with its contractual duties and/or followed industry best practices and issued them debit cards with EMV chips and taken other reasonable steps to prevent fraud.

86.   Plaintiff Harrington and other members of the Class were injured because they were forced to spend hours dealing with and navigating Money Network's customer service bureaucracy which was understaffed and ill-equipped to assist Class members.

87.   Money Network's unfair practices are not outweighed by any countervailing benefits to the Class, taxpayers, or competition.

88.   The injuries Money Network's unfair practices caused the Class could not be avoided since: (1) Class members who were not eligible for direct deposit and who wished to receive MCTR debit cards had no choice but to receive them from Money Network; and (2) Class members did not, and could not, know that Money Network would commit the unfair acts and practices herein alleged.

89.   Plaintiffs, on behalf of themselves and the Class and applicable Subclasses, seek restitution, disgorgement, and other equitable relief, including injunctive relief (a) prohibiting Money Network from continuing its unfair business practices, and (b) requiring the Money Network to take reasonable measures to prevent future unauthorized use of MCTR debit cards, including prospectively issuing EMV chip enabled cards to qualified recipients who have not yet received their MCTRs and retrospectively re-issuing EMV chip enabled debit cards to qualified recipients who received chip-less cards but have not yet fully used their MCTR refunds.

## SECOND CAUSE OF ACTION AGAINST MONEY NETWORK AND FISERV
### NEGLIGENCE
#### *On behalf of the Class*

90.   Defendant Money Network was under no duty or obligation to contract with the FTB to administer the MCTR.  But it still stepped forward, submitted a response to the state's RFP, and then entered the Agreement.  There were other service providers standing ready to help the FTB rescue taxpayers from the effects of inflation and economic disruption.  By entering the Agreement, Defendant prevented these other financial services companies from stepping in to help the FTB deliver the financial rescue authorized by the Better for Families Act.

91.     Defendant had a standard-issue duty of reasonable care running to the Class.  But it *also* had a duty of reasonable care running to the class that stemmed from its **special relationship** with the Class, as evidenced by the following facts:

    a.  At the time it entered the Agreement, Defendant Money Network understood that it would play a critical role in providing often desperately-needed financial relief to taxpayers of low and moderate means living in the state with the third-highest cost of living in our country.  Money Network knew that the MCTR payments it would be distributing were intended to directly and meaningfully affect Class members by providing them a vital financial lifeline in a time of economic uncertainty.

    b.  The harm to the Class as a result of Money Network's tortious conduct was highly foreseeable if not utterly predictable: if you distribute millions of dollars using debit cards with just magnetic stripes and no chip protection, it should be no surprise when fraudsters exploit the low-security cards to steal funds.

    c.  The economic damages Class members suffered as a result of Money Network's tortious conduct are clear, definite and certain.

    d.  There is a tight nexus between defendant's maladministration of the MCTR payment program and the injuries suffered by the Class: if Money Network had exercised reasonable care in implementing fraud-prevention measures and distributing MCTR debit cards to qualified taxpayers, Class members like Plaintiffs Silva and Harrington would have had the full benefit of their MCTR.

    e.  Money Network's conduct in taking millions of dollars from California taxpayers and then skimping on fraud-prevention measures and customer service staffing and logistics was morally reprehensible.

    f.  There is a strong policy of preventing future harm and demonstrating that for-profit corporations that enter government contracts relating to the administration of government benefits and then fail to deliver the promised services or shoddily deliver the promised services in a manner that frustrates

their purposes and intent, to the detriment taxpayers and the intended beneficiaries of the contracts alike, will be held accountable.

92.     Money Network also has a duty of care to the Class **arising from statute**. Specifically, California Revenue and Taxation Code section 19554.2 provides that "[a]ny third-party vendor and any officer, employee, or agent, or former officer, employee, or agent, of a third-party vendor shall not disclose or use any information obtained from the Franchise Tax Board pursuant to this section except for the purpose of providing services relating to the distribution of payments pursuant to Section 8161 of the Welfare and Institutions Code." *See* Cal. Rev. & Tax. Code § 19554.2(b)(2).  This statute imposed a duty on Money Network to take reasonable care to ensure it did not inadvertently disclose, for example to fraudsters, information obtained from the FTB concerning "qualified recipients" of the MCTR.

93.     On information and belief, Money Network breached its duty of reasonable care to the class by failing to exercise reasonable care in, among other things:

    a. Issuing Class members debit cards that lacked EMV chips despite an awareness of the profound security risks inherent in relying solely on magnetic stripe technology;

    b. Failing to provide Class members reasonable notice that their MCTR payments are highly vulnerable to fraud by including instructions with the cards directing recipients to withdraw all funds from the MCTR debit cards ASAP after activation to limit the potential for fraudsters to steal the MCTR funds;

    c. Failing to ensure that its customer service representatives were capable of providing timely and effective to members of the Class calling to inquire about their non-receipt of the MCTR or fraudulent transactions;

    d. Failing to employ reasonable practices to monitor and identify fraudulent transactions on MCTR accounts; and

    e. Failing to exercise reasonable care to ensure it did not disclose information obtained from the FTB concerning "qualified recipients" of the MCTR

1  inadvertently to fraudsters.

2  94.    Class members, including Plaintiff Silva and Plaintiff Harrington, were injured by
3  Money Network's negligence insofar as, because of Defendants' failure to exercise
4  reasonable care, they were denied the full benefit of their MCTR.

5  95.    The damages suffered by the Class as a result of Money Network's negligence,
6  however, are not purely economic: Class members, Mr. Harrington among them, have
7  wasted significant time dealing with the fallout from Money Network's failure to exercise
8  reasonable care in administering the MCTR.   This time wasted dealing with Money
9  Network and the FTB is a compensable **non-economic injury**.

10  96.    The damages suffered by the Class as a result of Money Network's negligence were
11  reasonably foreseeable because Money Network knew or should have known about the
12  security risks inherent in foregoing EMV chips and relying on magnetic stripe technology
13  and knew, or should have known, that the customer service resources it was devoting to
14  administering the MCTR were insufficient to ensure that Class members would not be
15  forced to waste significant time attempting to contact Money Network about problems with
16  their MCTR.

17  <u>**THIRD CAUSE OF ACTION AGAINST MONEY NETWORK AND FISERV**</u>

18  **BREACH OF FIDUCIARY DUTY**

19  ***On behalf of the Class***

20  97.    Defendants owed a fiduciary duty to Plaintiffs in connection with the administration
21  of California's MCTR because:

22      a. The Parties' bargaining positions were wildly unequal.  Unlike the typical
23         relationship between a bank and a depositor where the depositor has numerous
24         options available to it and can make a reasoned decision about where to bank,
25         Class members had limited choice over the manner in which they would
26         receive their MCTR benefits: if they wanted to receive an MCTR debit card,
27         their only option was Money Network.  Additionally, Plaintiff Harrington's
28         experience being told that he could not receive his MCTR via a check from the

FTB instead of a via a Money Network debit cards suggests that, in practice, a MCTR debit card was, at least for some Class members, the only way they could receive their MCTR.

b. Class members were not motivated by profit; they engaged with Money Network merely to obtain funds allocated for them by the Legislature and designed to help them weather the financial storm of inflation and economic disruption that ravaged California's economy in the early 2020s.

c. Delayed lump-sum contract damages would not adequately the Class for the damages they've suffered as a result of their inability to obtain the full benefit of the MCTR payment since the payment was designed to provide a financial lifeline to qualified recipients during a period of rampant inflation and financial upheaval, and money damages provided months or years later, once the financial disruptions that precipitated the MCTR had abated, would be insufficient to compensate the Class for their injuries.

d. Class members were especially vulnerable to harm because many of them had been adversely impacted by the economic disruptions that prompted the MCTR, for example the COVID-19 emergency and rampant inflation, and were counting on the MCTR to provide them some economic relief and hedge against economic insecurity.

e. Money Network was aware that the Californians whose MCTR benefits it was administering were, as people of low and moderate means, uniquely vulnerable to harm. Class members' special vulnerability to harm is evidenced by the Legislature's declaration in the Better for Families Act that "[i]ncreased costs for goods, including gas, due to inflation, supply chain disruptions, the effects of the COVID-19 emergency, and other economic pressures have had a significant negative impact on the financial health of many Californians."

98.    Pursuant to its fiduciary duty to the Class, Money Network was required to strive to ensure that legitimate MCTR beneficiaries received the full benefit of their MCTR and were

not denied all or some of their benefits due to either Money Network's failure to distribute the benefits or scammers' depletion of Class members' MCTR accounts.

99.    Money Network failed to act as reasonable fiduciary would under the circumstances. Specifically, it failed to take reasonable measures to ensure MCTR debit cards reached all Californians entitled to receive an MCTR.   Defendants also issued thousands of MCTR debit cards that did not have EMV chips and failed to appropriately notify Class members of the high risk that their MCTR would be subjected to hacking.

100.    Plaintiffs and the members of the Class were harmed by these failures insofar as these failures deprived Plaintiffs of the full benefit of the MCTR.

101.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm. Plaintiffs and Class Members suffered both economic and non-economic damages as a direct result of Money Network's breach of fiduciary duty.   The amount of these damages will be established according to proof at trial.

102.    A constructive trust has been formed in which Money Network is the involuntary trustee for the benefit of Plaintiffs Silva and Harrington as well as the Class. The constructive trust encompasses the MCTR benefits that the Class has been unable to obtain as a result of MCTR's breach of fiduciary duty.

103.    Plaintiffs, on their own behalf and that of the Class and applicable Subclasses, request declaratory and injunctive relief as well as money damages and interest on those damages.

## FOURTH CAUSE OF ACTION AGAINST MONEY NETWORK AND FISERV

### BREACH OF CONTRACT (Third-Party Beneficiaries)

### *On behalf of the Class*

104.    Money Network and the FTB entered a contract under which Money Network would administer the distribution of the MCTR to qualified taxpayers, the Class among them.

105.    The Agreement imposed obligations on Money Network in connection with mitigating and preventing fraud, including using debit cards with EMV chips and providing evidence showing it was "preventing fraud at a success rate of ninety-nine percent (99%) or higher."

106.   Plaintiffs Harrington and Silva and the Class are all intended third-party beneficiaries of the Agreement: the entire purpose of the Agreement between the FTB and Money Network was to provide a benefit to Plaintiffs and the rest of the Class, namely, the disbursement of the MCTR payments authorized by the California Legislature.  Providing this benefit to the Class was the central, primary, and motivating purpose for the contract between the FTB and Money Network.

107.   Plaintiffs and the Class members were all known to Money Network to be third-party beneficiaries of the agreement.  The Agreement's references to, for example, "qualified taxpayers" and "recipients" encompass Plaintiffs and the Class, all of whom are "qualified taxpayers" and are (or at least would be, if Money Network had done its job) "recipients" of the MCTR.

108.   Permitting Plaintiffs and the Class to assert a breach of contract claim against Money Network in connection with its breaches of the Agreement is consistent with the purpose of the Agreement.  Given the positionality of the Class vis-à-vis the Agreement, it should have been reasonably foreseeable to the contracting parties at the time of contracting that MCTR-recipients like Plaintiffs and the Class could, as intended third-party beneficiaries of the Agreement, properly assert breach of contract claims against the contracting parties.

109.   To the extent the Agreement imposed conditions or qualifications on Plaintiffs Harrington and Silva as well as the Class, they fulfilled all, or substantially all, of them and performed all conditions precedent to Money Network's performance.

110.   Money Network, in contrast, did not fulfil all of its obligations under the Agreement. On information and belief:

    a.   Money Network materially breached its obligation under the Agreement to use a "EMV (Europay, MasterCard, and Visa) chip enabled card to offer the maximum protection possible" by issuing thousands of MCTR debit cards that were not EMV chip enabled.

    b.   Money Network materially breached its obligation under the Agreement to "[p]rovide sophisticated fraud prevention services with evidence of preventing

fraud at a success rate of ninety-nine percent (99%) or higher" by failing to establish and maintain procedures for documenting and tracking fraud such that reliable evidence concerning the rate of fraud, and Money Network's rate of fraud prevention could be generated.  For example, Plaintiffs are informed and believe that for some period of time in late 2022, Money Network was automatically disconnecting calls to its customer service line due to "high call volume," effectively preventing callers from reporting fraud to it and, by extension, artificially reducing the amount of fraud reported.

c.  Money Network materially breached its obligation under the Agreement to "[p]rovide fraud prevention services from the point of receiving recipient account information and until all debit card balances have been exhausted by each recipient or returned to the state due to expiring" by failing to take reasonable measures to prevent fraud at every point from its receipt of recipient account information until the exhaustion of debit card balances.

111.  Plaintiffs and the Class were damaged by Money Network's breach of the Agreement insofar as the value of the disbursement and fraud-prevention services that Money Network actually provided for their benefit was lower than the value of the disbursement and fraud-prevention services that Money Network was obligated to provide for the Class's benefit under the Agreement.  Plaintiffs and the Class were also damaged by Money Network's breach of the Agreement insofar as, because of Money Network's breach, they did not receive the full benefit of the MCTR to which they were entitled.

112.  Plaintiffs, on their own behalf and that of the Class and applicable Subclasses, request declaratory and injunctive relief as well as money damages and interest on those damages.

## FIFTH CAUSE OF ACTION AGAINST MONEY NETWORK AND FISERV

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Third-Party Beneficiaries)

### *On behalf of the Class*

113.  In California, all contracts impose on a duty of good faith and fair dealing on their

parties.

114.   Money Network was invested with discretionary power over how to administer the MCTR program; Plaintiffs and the Class were directly impacted by the discretionary decisions Money Network made in connection with its administration of the MCTR program.

115.   Money Network's contract with the FTB states that Money network "will perform the requisite services to meet the following project objectives . . . Provide platinum (maximum) level fraud protection and client and customer service support."   The Agreement also imposed specific responsibilities on Money Network related to fraud prevention and customer service.  For example, the Agreement obliged Money Network to "[p]rovide sophisticated fraud prevention services with evidence of preventing fraud at a success rate of ninety-nine percent (99%) or higher."  It also obliged Money Network to "[p]rovide multi-channel customer service and support including self-service and live service including phone . . . ."

116.   Money Network breached the implied covenant of good faith and fair dealing by cutting corners in connection with the fraud prevention and customer service it provided in connection with the MCTR program in ways that injured the Class.  Specifically, Plaintiffs are informed and believe that Money Network made a suite of decisions about the resources that should be devoted (or not) to fraud prevention and customer service that collectively deprived Plaintiffs and the Class members of the benefits they were entitled to under the Agreement.  Some of the decisions, for example, the decision to issue non-EMV chip debit cards, were standalone breaches of Money Network's obligations under the Agreement.  But even those that weren't, for example skimping on customer service staffing such that a Class member who wanted to call in to report fraud would have to wait on hold for an extended period, when taken together, had the effect of denying the Class the customer service and fraud prevention benefits contemplated by the Agreement.

117.   For example, Plaintiffs are informed and believe that for some period in late 2022, Money Network was refusing to accept customer service calls: when a MCTR recipient

called in to, for example, report fraud, they would be told that due to high call volume their call could not be answered and then hung up on.  This practice, which was undoubtedly good for Money Network's bottom line, was detrimental to the Class because it meant not only were they denied live phone customer service but also that they could not report fraud. The upshot of this practice was to obscure the full scope and effects of Money Network's deficient fraud prevention services by making it impossible or unreasonably difficult for Class members to report fraud.

118.   As a direct result of Money Network's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class suffered actual damages and losses.

119.   Plaintiffs, on their own behalf and that of the Class and applicable Subclasses, request declaratory and injunctive relief as well as money damages and interest on those damages.

## **PRAYER FOR RELIEF**

Plaintiffs seek the following relief from the court on their own behalf and on behalf of the Class:

A.   An order certifying the Class and Subclasses defined above, appointing Plaintiffs as representatives for the Class, Plaintiff Harrington as representative for the No MCTR Subclass and Plaintiff Silva as representative for the No EMV Chip Subclass, and appointing Plaintiffs' counsel as counsel for the Class;

B.   Public injunctive relief in the form of an injunction forbidding Money Network from issuing chip-less cards to MCTR recipients, ordering it to implement reasonable fraud prevention measures and provide adequately, accessible, and reasonable levels of non-automated customer service, and requiring it to take reasonable steps to identify, and compensate, MCTR recipients who have, through Money Network's maladministration of the MCTR program, been denied the full benefit of the MCTR.

C.   A finding that such injunctive relief constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest, and otherwise meets the requirements of California Civil Procedure Code section 1021.5;

D.   Actual damages, including consequential damages, against Defendants in an

amount to be proven in trial;

      E.     Restitution damages;

      F.     Taxable costs;

      G.    Pre- and post-judgment interest as provided by law; and

      H.    Such other relief as the court deems just and proper.

## **JURY TRIAL DEMANDED**

      Plaintiffs demand a jury trial of the facts alleged above on all counts and issues so triable.

DATED: August 18, 2023             Respectfully submitted,


                          /s/ Kevin Kneupper

                          _____

                          Kevin Kneupper (SBN: 325413)

                          A. Cyclone Covey (SBN: 335957)
                          A. Lorraine Weekes (SBN: 332369)

                          **KNEUPPER & COVEY, PC**
                          17011 Beach Blvd., Suite 900
                          Huntington Beach, CA 92647
                          Tel: 657-845-3100
                          Fax: 855-596-3707

                          *Attorneys for Plaintiffs*